USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 8-23-12

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

K.L., by her parents M.L. and B.L.,

Plaintiffs-Appellants,

-v-

New York City Department of Education,
Defendant-Appellee.

---

11 Civ. 3733 (KBF)

MEMORANDUM & ORDER

KATHERINE B. FORRET, District Judge:

Plaintiffs-appellants, on behalf of their minor child, bring this action pursuant to the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400, et seq. (the "IDEA"). Plaintiffs seek review of the February 14, 2011 administrative decision of State Review Officer Justyn P. Bates (the "SRO") annulling the November 8, 2010 decision of Impartial Hearing Officer Rona Feinburg (the "IHO") and vacating the IHO's award of, inter alia, tuition reimbursement for K.L.'s attendance at the Rebecca School ("Rebecca") and the Manhattan Children's Center ("MCC") for the 2009-2010 school year.

Plaintiffs have moved for summary judgment, seeking an order reversing the SRO's decision and reinstating the IHO's award. Defendant has cross-moved for summary judgment, seeking an order upholding the SRO's decision and dismissing plaintiffs'

complaint. For the reasons set forth below, the Court DENIES plaintiffs' motion and GRANTS defendant's motion.

# I. BACKGROUND

## A. Factual Background

### *i. K.L.'s Disability*

K.L. is an eleven-year old girl with autism. (See Def.'s 56.1 Resp. ¶ 1.) She has significant delays, disorders and behavioral issues, including a tendency to chew and shred her clothes when not engaged in structured activity. (See, e.g., Ex. P-D ("IEP") at 4, 16.) It is undisputed that K.L. had an eligible disability during the 2009-2010, twelve-month school year (beginning in July 2009), entitling her to special education services and supports to provide her with a free, appropriate, public education ("FAPE"). (Def.'s 56.1 Resp. ¶ 1); see also 20 U.S.C. § 1400, et seq.

### *ii. Individualized Education Program*

On March 26, 2009, the Department of Education's ("DOE") Committee on Special Education ("CSE") held a meeting to develop an individualized education program ("IEP") for K.L. for the 2009-2010 school year. (Def.'s 56.1 Resp. ¶ 4.) Attending the meeting were K.L.'s mother, a DOE school psychologist (Rose Fochetta), a DOE special education teacher (Feng Ye), K.L.'s teacher at Rebecca, her current school (Sari Goldsmith) and a parent representative (collectively the "CSE team"). (Pl.'s

56.1 Resp. to ¶ 9; Ex. P-D ("IEP") at 2; Tr. 206.) The DOE psychologist had prepared a draft of certain pages of the IEP in advance and brought the draft to the meeting with her, where it was read aloud and discussed. (Tr. 206.)

In preparing the final IEP, the CSE team used many documents that described the child's functioning and academic and behavioral needs, including a December 2008 Multidisciplinary Report of Progress from Rebecca and a March 2009 classroom observation. (Pls.' 56.1 Resp. to ¶ 10.) The DOE's classroom observation was not given to K.L.'s mother prior to the meeting, but she had time to read it there. (Tr. 1070-71; see also Pls.' 56.1 ¶ 8, Def.'s 56.1 ¶ 11.) The team discussed how K.L.'s behaviors, including her aggression and attention difficulties, seriously interfered with her instruction, requiring one-to-one support. (Pls.' 56.1 Resp. to ¶ 14.)

The IEP calls for (a) a 6:1:1 (six students, one teacher, one paraprofessional) special education class; (b) five 30-minute speech/language sessions per week; (c) five 30-minute occupation therapy sessions per week; (d) three 30-minute physical therapy sessions per week (with (b) and (c), the "related services"); and (e) a 1:1 crisis management paraprofessional. (Def.'s 56.1 Resp. ¶ 5; IEP at 4, 13, 15.) The IEP does not provide "methods of measurement" for each of

K.L.'s goals, but the "participation in assessments" section states that K.L. would be assessed by "[t]eacher made materials and observations," and the goals section states that "[t]here will be 3 reports of progress this school year." (IEP at 6-12, 15.) At the IEP meeting, K.L.'s mother agreed with the related services recommendation. (Tr. 1150.) No specific, school placement was discussed at the meeting. (Tr. 269.)

A Behavior Intervention Plan ("BIP") was also developed for K.L, which described certain interfering behaviors, including her distractibility, extremely short attention span, "frequent out of seat behavior," "chewing/shredding clothes" and "hitting, kicking behaviors." The BIP also outlined strategies for changing K.L.'s behavior, the support to be provided to K.L. to implement those strategies, and the expected changes. (IEP at 16.) The CSE team did not conduct a functional behavior assessment ("FBA") because, according to the DOE psychologist, they already "had a relatively solid understanding of the functions of [K.L.'s] behavior," specifically, K.L.'s difficulty in communicating and feeling overwhelmed. (Tr. 254-55; see also IEP at 4.)

On May 28, 2009, plaintiffs signed a summer-only contract with Rebecca. (Pls.' 56.1 Response to ¶ 66.) On June 11, 2009, the DOE issued a Final Notice of Recommendation (the "FNR"), recommending placing K.L. in a 6:1:1 class at P94 @ P15. (Ex.

P-GG.) As of July 1, 2009, Alison Koren, a New York City Teaching Fellow, taught the 6:1:1 2nd/3rd grade class, to which K.L. was assigned. (See Pls.' 56.1 Resp. to ¶ 39.) During the summer of 2009, Ms. Koren had a "transitional license," while she pursued her Master's Degree in general and special education. (See id. to ¶ 41.) Ms. Koren's classroom was on the third floor of P94 @ P15, and the therapy and sensory rooms were on the fourth floor. (Tr. 55-56; see also Pls.' 56.1 Resp. to ¶¶ 48-49.) Adults accompanied Ms. Koren's students when they traveled between floors. (See Tr. 70-71; see also Pls.' 56.1 Resp. to ¶ 50.)

During the summer of 2009, Ms. Koren had five students in her class, at least four of whom had autism. (Pls.' Resp. to ¶ 42; Tr. 59-61.) The class had a classroom paraprofessional, Ms. Santana, who aided students by providing one-one-support if needed, doing small group work, monitoring lunch and recess, running afternoon snack and helping with a student's toilet training. (Tr. 61-62; see also Pls.' 56.1 Resp. to ¶¶ 43-45.) One of the students also had a behavior management aide, Ms. Hernandez, who played a role similar to Ms. Santana because the behavior of the student to whom she was assigned had improved to the point where he only needed to be closely watched during recess; she assisted the other students with small group, 1:1 instruction and toilet training. (Tr. 63-64; Pls.' 56.1 Resp.

to ¶¶ 46-47.) Ms. Koren testified that she had a student, who spent the entire day in 1:1 instruction when he began the summer program. (Tr. 138-39.) Ms. Koren also had access to an autism coach at P94 @ P15. (Tr. 51-52, 144, 158-59.)

By letter dated June 17, 2009, K.L's parents informed DOE that they were in receipt of the FNR identifying P94 @ P15 as the assigned school, and that they had left several messages with that school about arranging a visit, but had not received a response. (Ex. P-EE.) The letter further advised that until the parents had the opportunity to visit the school and assess its appropriateness, K.L. would continue to attend Rebecca for the 2009-2010 school year and continue to receive the additional, 20 hours of Applied Behavior Analysis ("ABA") services and four hours of occupational therapy a week that she was currently receiving. (Id.) The parents indicated that they would seek reimbursement for those services. (Id.) According to K.L.'s mother, she first received the IEP on June 24, 2009, despite multiple prior requests. (E.g., Tr. 1093-94.) The DOE psychologist did not know what caused the delay with respect to the parents' receipt of the IEP, testifying the she had confirmed K.L.'s parents' address at the CSE meeting and that the IEP was mailed after the meeting. (Tr. 305.)

On July 30, 2009, K.L.'s parents wrote to DOE again, stating that they had not yet received a response to their June

17 letter, and that until they heard from DOE regarding an appointment to view the school, K.L. would remain enrolled at Rebecca and "as of September 2009 . . . attend[] the Manhattan Children's Center." (Ex. P-F.) The parents also noted that K.L. would continue to receive the additional services identified in the June 17 letter, as well as an unspecified amount of speech-language therapy, and that the parents would be seeking reimbursement for those services. (Id.)

K.L. attended Rebecca from July to August 2009 and MCC from September 2009 to June 2010. (Pls.' 56.1 Resp. to ¶ 4.) K.L. also received at-home, ABA services and speech, language, and occupational therapy during the 2009–2010, twelve-month school year. (Id. to ¶ 6.) Because K.L. had difficulty walking up and down the stairs at MCC, she used the boys' bathroom because the school does not have an elevator, and there was no girls' bathroom on her classroom's floor. (Def.'s 56.1 ¶ 75; Tr. 578, 721.) At MCC, K.L. received three 30-minute sessions of speech/language therapy and two-30 minute sessions of occupational therapy per week (i.e. less than in the IEP) – the therapy sessions were on different floors requiring K.L. to use the stairs. (Pls.' 56.1 Resp. to ¶ 77; Tr. 596; IEP.) K.L. did not receive physical therapy during the 2009-2010 school year at MCC, which does not have an onsite physical therapist. (Tr. 646.)

B. Procedural Background

On June 29, 2009, plaintiffs filed a due process complaint, seeking tuition-funding relief for K.L.'s 2009-2010, twelve-month school year because the DOE failed to provide K.L. with a FAPE. (Ex. P-A.) On September 21, 2009, plaintiffs amended their complaint to include MCC. (Ex. P-E.) The complaint identifies a number of alleged, procedural and substantive deficiencies with the IEP, including that "[t]o the extent, if at all, that [the] 'placement' was proposed by the NYCDOE outside of the IEP meeting, such placement and program was not appropriate and 'reasonably calculated' to meet [K.L.'s] individual needs." (Id. (emphasis original).) The complaint does not allege that P94 @ P15 would have been an unsafe placement for K.L., due to the stairs or a dangerous environment. (See id.)

Plaintiffs requested reimbursement for "(a) tuition and costs related to [K.L's] attendance at the Rebecca School for July and August 2009; (b) tuition and costs related to [K.L's] attendance at MCC for September 2009 through June 2010; (c) 20 hours per week of 1:1 SEIT/ABA services; (d) two hours per week of 1:1 speech and language therapy; (e) four hours per week of 1:1 occupational therapy; and (e) transportation to and from school, all as part of a twelve month program." (Id.)

A hearing was held before the IHO on July 24, 2009 and April 8, May 4, May 17, June 2, June 23, July 8 and July 13, 2010. (IHO Findings of Fact and Decision ("IHO Decision").) Among others, Ms. Fochetta (the DOE psychologist who participated in the IEP meeting), Ms. Koren (the teacher of the proposed class at P94), K.L.'s mother, Tina McCourt (the Rebecca program director), Dr. Amy Davis-Lackey (the MCC program director), and Ilana Garcia (K.L.'s head teacher at MCC) testified at the hearing. (Id. at 1-2.)

On November 8, 2010, the IHO issued her Findings of Fact and Decision, finding that defendant had not offered K.L. a FAPE for the 2009-2010 school year and ordering reimbursement for the summer program at Rebecca, the September through June program at MCC, 20 hours per week of home-based, ABA therapy, and K.L.'s transportation for the 2009-2010 school year. (IHO Decision at 75-76.) The IHO found that equitable considerations precluded reimbursement for K.L.'s home-based, speech/language and occupational therapy. Specifically, the IHO noted that the IEP mandated five 30-minute sessions per week of both speech and occupational therapy and that the parents, aware of that fact, instead chose to place K.L. at MCC, which did not provide those services. (Id. at 75.) In reaching her conclusions, the IHO credited the testimony of all of the witnesses who appeared at the hearing. (Id. at 65.)

With respect to her finding that DOE did not offer K.L. a FAPE, the IHO stated that "[a]ll of the witnesses at the hearing who actually know the child agreed that the child required a one-to-one instructor with her at all times." (Id. at 66.) Although the IHO acknowledged that DOE recommended a behavior management paraprofessional on the IEP, she found that "there was no evidence presented at the hearing as to how this paraprofessional would approximate a one-to-one instructor." (Id.) According to the IHO, the child "was not a behavior problem in the usual sense of the word;" rather, "her behavioral issues were related to the interplay of her autism and the onset of her puberty." (Id. at 66-67.) In addition, the IHO noted that there was "[n]o evidence . . . presented . . . about who the paraprofessional would have been[,] what credentials that person would have had," or whether he or she "would have been trained in working with children who have autism," or known how to address K.L.'s needs. (Id. at 67.) Finally, the IHO found that having to navigate the stairs at PS 94 & 15 would have resulted in an "unsafe atmosphere" for the child because of the noise level in the stairwell, the presence of other children using the stairs and K.L.'s unsteady gait. (Id.) The IHO did not identify any procedural deficiencies with the IEP in reaching her decision. (See id. at 66-67.)

In December 2010, defendant appealed the IHO's decision to New York State's Office of State Review. Plaintiffs argued that the IHO Decision should be affirmed, principally for the reasons cited by the IHO and for the other reasons cited in their due process complaint. They also argued that DOE had failed to present evidence regarding the student's assigned placement for the entire school year, just for the summer. (State Education Dep't Review Officer Decision ("SRO Decision") at 14-15.)

On February 14, 2011, the SRO issued a decision that DOE had offered K.L. a FAPE and annulled the IHO decision in toto. (SRO Decision at 21.) That decision is 21, single-spaced pages and cites extensively to both documentary evidence and the hearing transcript. (Id. passim.)

First, the SRO found that the March 2009 CSE team "had adequate evaluative information regarding the student's present levels of academic performance and specific education needs," including input from K.L.'s mother, to develop an appropriate IEP. (Id. at 17-18.) He based that finding on the following evidence:

- Testimony that the CSE team was provided with the December 2008, multidisciplinary report from Rebecca prior to the meeting and that DOE's psychologist reviewed the report, along with K.L.'s file, in preparation for the meeting. (Id. at 16-17 (citing Tr. 205-09, 1070-71).)
- Testimony, including from K.L.'s mother, that the Rebecca report was considered at the CSE meeting. (SRO Decision at 17 (citing Tr. 210, 1073).)

- Testimony that at the beginning of the CSE meeting, the classroom observation report for K.L. was provided to her mother, who was given time to review it. (SRO Decision at 17 (citing Tr. at 210, 230, 1170-71).)

- Testimony from the DOE psychologist that K.L.'s mother did not voice any concerns about the observation report. (SRO Decision at 17 (citing Tr. at 230, Ex. D-4).)

- Testimony from the DOE psychologist that she prepared draft portions of the IEP, based on the Rebecca report, and brought the draft IEP to the CSE meeting, where she read it aloud and invited all CSE members to participate in editing the draft. (SRO Decision at 17 (citing Tr. 206, 215).)

- Minutes from the CSE meeting, indicating that the student's levels of performance were discussed with the K.L's mother and teacher and that they provided input regarding the child's functioning, goals and objectives and BIP. (SRO Decision at 17 (citing Tr. 217, 219-20, 229, Ex. D-4).)

Second, the SRO found that the IEP created by the CSE team "accurately reflected the results of the evaluative information and adequately identified the student's needs." (SRO Decision at 18.) Specifically, he noted that the IEP reflected K.L.'s "academic deficits and her significant delays in speech-language development, social skills, and skills in daily living," "her attending difficulties, difficulty remaining 'regulated,' tendency to become aggressive when overwhelmed <u>or mouth cloth or string when anxious</u>," and that she "was not toilet trained and had food sensitivities." (<u>Id.</u> at 17 (emphasis added) (citing IEP at 3-5).) In determining that the IEP addressed those needs, the SRO found, among a number of other things, that the IEP addressed K.L.'s "aggressive and '<u>stringing</u>' behaviors

through the development of a [BIP] and the assignment of a 1:1 crisis management paraprofessional to the student" (SRO Decision at 17 (emphasis added) (citing Tr. 216-20, 253, 258-59, IEP at 4)), and "provided for social-emotional management supports of frequent sensory/movement breaks between activities, modeling of appropriate social interactions, access to sensory materials, and the use of a brushing protocol (SRO Decision at 17 (citing Tr. 215-16; IEP at 4)). The SRO also found significant that K.L.'s mother agreed with the related-services recommendations (SRO Decision at 18 (citing Tr. 225-26, 1089, 1149-50)) and that testimony indicated that the goals and objectives in the IEP were based on the Rebecca 2008, multidisciplinary report, as well as input from K.L.'s teacher and mother (SRO Decision at 18 (citing Tr. 211, 220, 224-25, Ex. D-4)).

With respect to K.L.'s instructional needs, the SRO found that the recommended program satisfied K.L.'s need for 1:1 instruction.[1] (SRO Decision at 18-20.) Specifically, he noted Ms. Koren's testimony that she provided 30-50 minutes of 1:1 instruction to each student each school day and that the maximum amount of 1:1 instruction was dependent on the student's needs –

[1] The SRO also found that Ms. Koren's curriculum (employing "elements of TEACCH and ABA"), the tracking of student progress at P94 @ P15, and the resources at the school (such as a sensory room) met K.L.'s other needs. (SRO Decision at 18-19 (citing, e.g., Tr. 52, 55-56, 88, 131-34, 137, 140, 149-50, 181-82, 189-90).)

up to the whole day.[2] (Id. at 18-19 (citing Tr. 138-39).) He also noted that K.L. was scheduled to receive 13 sessions per week of individual, related-services in the form of speech/language, occupational and physical therapy. (SRO Decision at 19-20 (citing IEP at 15).)

The SRO disagreed with the IHO's conclusion that "there was no evidence presented at the hearing as to how th[e] paraprofessional would approximate a one-to-one instructor." (IHO Decision at 66; see also SRO Decision at 19.) According to the SRO,

> The school psychologist testified that the role of the recommended 1:1 crisis management paraprofessional was delineated at the March 2009 CSE meeting and outlined in the student's [BIP] (Tr. pp. 216-17). A review of [DOE's BIP] shows that it addressed many of the student's deficits that, according to the parents' witnesses, necessitated 1:1 instruction. Specifically the plan, which [DOE's] paraprofessional would implement under the direction of a 'licensed' special education teacher, addressed the need to assist the student with communication, and the need to decrease the student's mouthing of string and aggressive behaviors (Tr. pp. 301-02; Parent Ex. D at p. 6[3]).

(SRO Decision at 19.)

The SRO also found erroneous the IHO's conclusion that P 94 @ P15 would have been an "unsafe atmosphere" for K.L. (Id. at

---

[2] In a footnote, the SRO added that, under state regulations, "a 6:1+1 class is designed to address the needs of students 'whose management needs are determined to be highly intensive, and requiring a high degree of individualized attention and intervention.'" (Id. at 18 n.13 (emphasis added) (quoting 8 N.Y.C.R.R. § 200.6(h)(4)(ii)(a)).)

[3] Based on the SRO's discussion, the Court believes this citation should be to page 16 of the EIP, which was the BIP, and which supports the SRO's finding. (Ex. P-D at 16.)

20.) The DOE "correctly asserts that no concerns regarding the safety of the assigned school were raised in the parent's due process complaint notices," the SRO determined. (Id. (citing Exs. P-A, P-E).) He then cited certain statutes and regulations, which provide that a party requesting an impartial hearing may not raise issues at the hearing that were not raised in the original, due process complaint, unless the other party agrees or the IHO gives prior permission. (SRO Decision at 20 (citing 20 U.S.C. §§ 1415(c)(2)(E)(i)(II),(f)(3)(B); 34 C.F.R. §§ 300.508(d)(3)(i)-(ii), 300.511(d); 8 N.Y.C.R.R. §§ 200.5(i)(7)(b), (j)(1)(ii)).)

Finally, the SRO disagreed with the IHO's finding that K.L.'s at-home services were "a necessary component of the child's program." (IHO Decision at 74; see also SRO Decision at 20.) Specifically, the SRO cited K.L.'s mother's testimony that she didn't want to place K.L. in a residential facility and was trying to give the child services "to maximize her potential." (Tr. at 1127-28; SRO Decision at 20.) While "[i]n general, the evidence suggests that the parents may require assistance in the supervision and custodial care of their daughter in the home and that the student may benefit from the generalization of skills afforded by home instruction," the SRO stated, "there is insufficient evidence in the record to find that this student's supervision and custodial care on the weekends, holidays, and

vacations must be provided in the form of 1:1 ABA services." (SRO Decision at 20.) According to the SRO,

> [a]lthough it is understandable that the parents, whose daughter has substantial needs, desired greater educational benefits through the auspices of special education, that does not mean that [DOE] has failed to comply with its obligations to offer the student an education plan that was specially designed for the student and from which there [was] reasonable likelihood that the student would receive some educational benefit."

(Id.)

Having determined that DOE provided K.L. with a FAPE, the SRO did not consider the appropriateness of the plaintiffs' unilateral placements (at Rebecca and MCC) or equitable considerations. (Id. at 21.)

On June 1, 2011, plaintiffs filed the complaint commencing this action, appealing the SRO's decision. (Compl.)

## II. THE STATUTORY SCHEME

### A. The IDEA

The IDEA was enacted "to ensure that all children with disabilities have available to them a free appropriate public education . . . designed to meet their unique needs . . . [and] to ensure that the rights of children with disabilities and parents of such children are protected." 20 U.S.C. § 1400(d)(1)(A)-(B). "IDEA authorizes reimbursement for the cost of private special-education services when a school district fails to provide a FAPE and the private-school

placement is appropriate." E.g., Forest Grove Sch. Dist. V. T.A., 557 U.S. 230, 247 (2009). To meet the requirements of the IDEA, the program offered by the school district "must provide special education and related services tailored to meet the unique needs of a particular child, and be reasonably calculated to enable the child to receive educational benefits." Gagliardo v. Arlington Cent. Sch. Dist., 489 F.3d 105, 107 (2d Cir. 2007) (internal quotations omitted).

Such services are statutorily required to be "administered according to an [IEP], which school districts must implement annually." Id. (citing 20 U.S.C. § 1414(d)). An IEP is adequate under the IDEA if it is "likely to produce progress, not regression, and if the IEP affords the student with an opportunity greater than mere trivial advancement." T.P. ex rel. S.P. v. Mamaroneck Union Free Sch. Dist., 554 F.3d 247, 254 (2d Cir. 2009) (internal quotation marks omitted). An IEP is not required to "furnish every special service necessary to maximize each handicapped child's potential." Grim v. Rhinebeck Cent. Sch. Dist., 346 F.3d 377, 379 (2d Cir. 2003) (internal quotations omitted). In developing an IEP, a state-assigned committee is required to consider four factors: "(1) academic achievement and learning characteristics, (2) social development, (3) physical development, and (4) managerial or behavioral needs." Gagliardo, 489 F.3d at 107-08.

If a parent believes an IEP is insufficient under the IDEA, he or she may challenge it to an IHO. 20 U.S.C. § 1415(f). At the hearing before the IHO, "the school district has the burden of demonstrating the appropriateness of its proposed IEP." Grim, 346 F.3d at 379. The IHO's decision may then be appealed to an SRO.

A party "aggrieved" by an SRO ruling, in turn, "shall have the right to bring a civil action" in state or federal court. 20 U.S.C. § 1415(i)(2)(A). "When such an action is brought in federal district court, the court reviews the records of all of the prior administrative hearings and must hear additional evidence if so requested by either of the parties." M.H. v. NYC Dep't of Ed., 685 F.3d 217, 225 (2d Cir. 2012). "The court typically considers the propriety of the IEP on the parties' cross motions for summary judgment." Id.

Deciding a motion for summary judgment in an IDEA case, however, involves a more substantive inquiry than merely whether a disputed issue of fact is present. "Rather, the motion serves as a pragmatic procedural mechanism for reviewing a state's compliance with the procedures set forth in [the] IDEA and determining whether the challenged IEP is reasonably calculated to enable the child to receive educational benefits." Lillbask ex rel. Mauclaire v. State of Conn. Dep't of Educ., 397 F.3d 77, 83 n.3 (2d Cir. 2005) (internal quotations omitted). "[B]asing

its decision on the preponderance of the evidence, [the court is required to] grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C)(iii).

B. Deference Owed to Administrative Findings

The parties here dispute the amount of deference this Court owes to the SRO's administrative decision, with plaintiffs arguing for a "modified de novo review" and "pure[] de novo review" for "the core issue of whether there was a denial of a FAPE." (Pl.'s Mem. at 5.) Since the parties' briefing in this matter, however, the Second Circuit issued its decision in M.H. v. New York City Dep't of Educ., 685 F.3d 217 (2d Cir. 2012), which resolves any ambiguity about the deference owed to an SRO decision, particularly where, as here, the SRO reversed an IHO decision.

It is well established that "the role of the federal courts in reviewing state educational decisions under the IDEA is circumscribed." Gagliardo, 489 F.3d at 112 (internal quotation marks omitted). Courts "must engage in an independent review of the administrative record and make a determination based on a 'preponderance of the evidence,'" id., but such review "is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities they review," Bd. Of Educ. Of Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S. 176, 206 (1982). Rather, a court

must give "due weight" to the administrative proceedings. Gagliardo, 489 F.3d at 113 (internal quotation marks omitted).

Courts may not "make subjective credibility assessment[s]" or "ch[oose] between the views of conflicting experts on . . . controversial issue[s] of educational policy . . . in direct contradiction of the opinions of state administrative officers who ha[ve] heard the same evidence." Grim, 346 F.3d at 383. In addition, administrative determinations that are "based on [the officers'] substantially greater familiarity with the evidence and the witnesses than the reviewing court" –- e.g. those regarding "the substantive adequacy of an IEP" or "an appropriate educational methodology" -- should be afforded more weight. M.H., 685 F.3d at 244. "[T]he district court should afford more deference when its review is based entirely on the same evidence as that before the SRO than when [it] has before it additional evidence that was not considered by the state agency." Id.

Courts "generally defer to the final decision of the state authorities, even where the [SRO] disagrees with the hearing officer." Id. at 241 (internal quotation marks omitted). "If the SRO's decision conflicts with the earlier decision of the IHO, the IHO's decision may be afforded diminished weight." Id. (internal quotation marks omitted). Indeed, "[w]here the IHO and SRO disagree, reviewing courts are not entitled to adopt the

conclusions of either state reviewer according to their own policy preferences or views of the evidence; courts must defer to the reasoned conclusions of the SRO as the final state administrative decision." Id. at 245 (emphasis added). Deference "is particularly appropriate when the SRO's review has been thorough and careful," Id. at 241 (internal quotation marks omitted). Only where the SRO's factual findings are not "reasoned [or] supported by the record" is deference inappropriate. Id.

C. Issues for Judicial Review

In undertaking an analysis under the IDEA, courts proceed with an initial two-part review (typically called "Prong I"): "First, the district court should ask whether the State has complied with the 'procedures set forth by the act.' And, second, the court should decide whether 'the [IEP] developed through the Act's procedures [is] reasonably calculated to enable the child to receive educational benefits.'" Id. at 242 (quoting Rowley, 458 U.S. 176, 206-07 (1982)). If the IEP is either procedurally or substantively deficient, "the court then asks whether the private schooling obtained by the parents for the child is appropriate to the child's needs" (typically called "Prong II"). Id. at 245 (internal quotations and citation omitted). The Court also considers as relevant "equitable

considerations relating to the reasonableness of the action taken by the parents" (typically called "Prong III"). Id.

*i. Procedural Compliance*

Not every procedural error will render an IEP legally inadequate. Id. Rather, relief is warranted only if the alleged procedural inadequacies "(I) impeded the child's right to a [FAPE]; (II) significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of [a FAPE] to the parents' child; or (III) caused a deprivation of educational benefits." 20 U.S.C. § 1415(f)(3)(E)(ii).

Procedurally, an IEP must contain: (1) the student's present levels of academic achievement and functional performance; (2) measurable annual goals for the student; (3) the method used to measure the student's progress toward those goals; (4) the special education and related services that the IEP recommends; (5) an explanation of the extent to which the student will be educated with "nondisabled" peers; (6) the reasons for any alternative assessments; and (7) the start date for recommended services, their duration, and their frequency. 20 U.S.C. § 1414(d)(1)(A); 8 N.Y.C.R.R. tit. 8 § 200.4(d)(2); accord M.H., 685 F.3d at 245.

*ii. Substantive Compliance*

The "appropriate education mandated by the IDEA does not require states to maximize the potential of handicapped children." M.H., 685 F.3d at 245 (internal quotation marks omitted). Rather, the IDEA provides only for a "basic floor of opportunity . . . consist[ing] of access to specialized instruction and related services which are individually designed to provide educational benefit to the handicapped child." Rowley, 458 U.S. at 201 (internal quotation marks omitted). An IEP is appropriate if it "is likely to produce progress, not regression" and provides an opportunity for more than "trivial advancement." Walczak v. Florida Union Free School Dist., 142 F.3d 119, 130 (2d Cir. 1998) (internal quotation marks omitted).

*iii. Appropriateness of Alternative Placement*

If the Court finds the IAP to be procedurally and/or substantively deficient, then "the burden shifts to the parents to demonstrate that the school in which they have chosen to enroll their child is appropriate." Gagliardo, 489 F.3d at 112. The "unilateral private placement is only appropriate if it provides education instruction specifically designed to meet the unique needs of a handicapped child," not where "the chief benefits of the chosen school are the kind of . . . advantages . . . that might be preferred by parents of any child, disabled or

not." Id. (emphasis original, internal quotation marks omitted).

III. DISCUSSION

In this case, the Court finds ample reason to defer to the SRO's conclusion that DOE provided K.L. with a FAPE for the 2009-2010 school year. That decision is not only well-reasoned and supported by the record, but also thorough and careful, making deference "particularly appropriate." M.H., 685 F.3d at 241, 245. Moreover, the SRO's determinations largely, if not exclusively, concern "the substantive adequacy of an IEP" –- a type of determination that the Second Circuit has said is entitled to more weight. Id. at 244. Finally, the parties have introduced no new evidence in this proceeding that was not before the IHO or SRO, and so this Court "should [also] afford more deference" on that basis. Id.

In light of that deference, this Court concludes, like the SRO, that DOE has satisfied its burden of providing a FAPE. The Court also finds unpersuasive the numerous, particular deficiencies alleged by plaintiffs on this appeal, which it addresses specifically here.

A. Failure to Develop a FBA or Appropriate BIP

Plaintiffs first assert that DOE failed to include any information in the IEP about "how K.L. shreds her clothes with her mouth and literally eats her clothes off her body," to

determine “the function” of that behavior through a FBA, or to provide goals to rectify such behavior. (Pls.’ Mem. at 8-10.) The Court disagrees. First, both the IEP and the BIP note that K.L. mouths and shreds cloth, and the BIP sets out goals to limit K.L.’s stringing behavior. (IEP at 4, 16 (including as a goal that “[K.L.] will decrease the frequency of chewing/shredding of her clothes and increase use of words to express her feelings”).) Second, as the SRO found, hearing testimony demonstrated that the 1:1 crisis paraprofessional and the BIP were adequate to address those problems. (SRO Decision at 17 (citing Tr. 216-20, 253, 258-59; IEP at 4)); see also Tr. 252; IEP at 16.) While plaintiffs assert, based on the testimony of the DOE psychologist, that the BIP was “not provided to K.L’s parents at the IEP meeting,” that same testimony makes clear that the BIP was verbally formulated at the meeting “with all members participating,” and then typed later. (Pls.’ Mem. at 9-10; Tr. 234; see also Tr. 217 (the BIP “was written at the meeting with all the members participating, and we went through each section”).)

The DOE psychologist also testified that the CSE team did not conduct a FBA because it already “had a relatively solid understanding of the functions of [K.L.’s] behavior;” “[t]hey were a function of a difficulty communicating, feeling overwhelmed.” (Tr. 254; see also, e.g., IEP at 4 (“[K.L.] may

demonstrate anxiety through mouthing or stringing clothes.”).) Moreover, the Second Circuit in T.Y. v. N.Y. City Dep’t of Educ., 584 F.3d 412 (2d Cir. 2009) found that DOE’s failure to do an FBA and a BIP did not deny a FAPE where there was “substantial evidence in the record” that a 1:1 crisis paraprofessional “provided significant benefits to [the child] in addressing problematic behaviors.” Id. at 419. Here, as the SRO found, there is substantial evidence in the record that a 1:1 aide has in the past significantly helped K.L.’s stringing and that the 1:1 crisis paraprofessional would be able to do the same. (See, e.g., SRO Decision at 17, 19; Tr. 216-20, 301-02, 429-30, 1143-44; IEP at 16.)

B. Failure to Include Methods of Measurement

Plaintiffs argue that the IEP is procedurally deficient because it contains no methods of measurement. (Pl.’s Reply at 3.) As an initial matter, the IEP does provide that K.L. will be assessed using “[t]eacher made materials and observations” -- two of the categories enumerated on the IEP as “methods of measurement” -- and provides with respect to K.L.’s goals that “[t]here will be 3 reports of progress this school year.” (IEP at 6-12, 15.) The SRO also found that Ms. Koren would monitor K.L.’s progress using data collection and tracking tools. (SRO Decision at 9 (citing Tr. 52, 88-89, 140, 149-50, 189-90).) Courts have repeatedly found the lack of methods of measurement

in an IEP not to deprive a student of a FAPE, so long as there are “evaluative measures in place to assess the student.” E.g., J.A. v. N.Y. City Dep’t of Educ., No. 10 Civ. 9056, 2012 U.S. Dist. LEXIS 46189, at *19-22 (S.D.N.Y. Mar. 28, 2012); accord P.K. v. N.Y. Dep’t of Educ., 819 F. Supp. 2d 90, 108-09 (E.D.N.Y. 2011); W.T., 716 F. Supp. 2d at 289; see also 20 U.S.C. § 1415(f)(3)(E)(ii).

C. Failure to Discuss Teaching Methodologies at CSE Meeting

Plaintiffs argue that the IEP was inadequate because DOE failed to discuss “any teaching or behavioral intervention methodologies” at the CSE meeting or to disclose such methods prior to the IHO hearing. (Pls.’ Mem. at 13; Pls.’ Reply at 8.) Plaintiffs cite no legal support for their position. It is well established that once an IEP satisfies the requirements of the Act, questions of educational methodology may be left to the state to resolve. See Rowley, 458 U.S. at 208. Here, the IEP recommends special education and related services and specifies “behavior intervention” strategies in the BIP. That is all that is required. See 20 U.S.C. § 1414(d)(1)(A); 8 N.Y.C.R.R. § 200.4(d)(2).

D. Failure to Include Meaningfully K.L.’s Parents in the Development of the IEP

As set forth above, a FAPE is denied where procedural inadequacies “significantly impede[] the parents’ opportunity to

participate in the decisionmaking process regarding the provision of a [FAPE] to the parents' child." 20 U.S.C. § 1415(f)(E)(ii)(II); see also Winkleman v. Parma City School Dist., 550 U.S. 516, 524 (2007) ("IDEA requires school districts to develop an IEP . . . with parents playing 'a significant role' in this process."). Here, plaintiffs cite three general reasons for why they were not meaningfully included in the IEP-process:

First, plaintiffs cite the fact that "certain pages" of the IEP were drafted prior to the CSE meeting and that they weren't given the draft or the classroom observation prior to the meeting. They also allege that "defendant had unilaterally determined K.L.'s related service mandates without discussion with K.L.'s parents or K.L.'s therapists" and that DOE "failed to consider any suggestions or modifications proposed by K.L.'s mother, teachers or providers." (Pl.'s Mem. at 11 (citing Tr. 206, 215, 230, 234).) Plaintiffs, however, mischaracterize the hearing testimony. That testimony made clear that although "pages four, five and nine" of the IEP were drafted in advance, the draft was brought to the meeting "and discussed," "[s]pecifically, [the psychologist] read the draft aloud and then invited all the team members to contribute, participating in modifying or changing the draft." (Tr. 206, 215); see also Cerra v. Pawling Cent. School Dist., 427 F.3d 186, 193 (2d Cir.

2005) ("[W]hen a school district brings drafts of some or all of the IEP content to the IEP meeting, the relevant inquiry is whether there was a full discussion with the child's parents, before the child's IEP [wa]s finalized, regarding drafted content . . . . ." (internal quotation marks omitted)). Plaintiffs' response to such testimony that "merely saying so did not make it so" distorts the "preponderance of the evidence" standard of review. (Pls.' Reply at 12 n.14.)

Additionally, none of the transcript pages cited by plaintiffs provides any support whatsoever for the proposition that the related-service mandates were set without discussion (see Tr. 206, 215, 230, 234), and, in any event, K.L.'s mother admitted that she agreed to the related-service recommendations in the IEP (id. 1149-50). K.L.'s mother also indicated that she had time to read the classroom observation at the meeting. (Tr. 1070-71.)

Second, plaintiffs argue that the CSE team never discussed a specific placement option at the meeting. (Pl.'s Mem. at 12.) The Second Circuit has held, however, that the failure of DOE to offer a specific school placement at a CSE meeting or in an IEP is not a "per se procedural violation of the IDEA." T.Y., 584 F.3d at 419-20. According to T.Y., the implementing regulations of the IDEA, which require, inter alia, that "the parents of a child with a disability must be afforded an opportunity to

participate in meeting with respect to . . . [t]he identification, evaluation, and educational placement of a child," 34 C.F.R. § 300.501(b)(1)(i), only require that the parents have an opportunity to participate with respect to "the general type of educational program in which the child is placed," not the specific brick and mortar site. T.Y., at 419 (internal quotation marks omitted). Although, as plaintiffs point out, the Second Circuit made clear that it was not giving school districts "carte blanche to assign a child to a school that cannot satisfy the IEP's requirements," that is not the case here.[4] Id.; (see also Pls.' Mem. at 12).

Third, plaintiffs argue that they were not provided with a copy of the minutes from the CSE meeting, despite K.L.'s mother's alleged request (Pls.' Mem. at 13 (citing Tr. 295)), and that they didn't get a copy of the IEP until three months after the meeting (Pls.' Mem. at 19). Preliminarily, the Court notes that the only page of the transcript plaintiffs cite regarding the minutes provides contrary evidence -- that K.L.'s mother did not ask for them. (Tr. 295 ("I don't recall her

[4] Plaintiffs also argue that DOE did not tell K.L.'s mother that she could meet with a placement officer to discuss placement options. (Pl.'s Mem. at 12.) Such a deficiency, while not to be encouraged, does not rise to the level of a denial of a FAPE. See 20 U.S.C. § 1415(f)(E)(ii)(II); Grim, 346 F.3d at 381-82. Additionally, to the extent that plaintiffs allege violation of the consent order in Jose P. v. Ambach, Nos. 79 Civ. 270, 560, 2562 (E.D.N.Y. 1988) –- and to the extent such consent order is not altered by T.Y. -- a remedy for violation of the order would lie with the Court that entered it, not in a separate proceeding. W.T. v. Bd. of Educ. N.Y. City, 716 F. Supp. 2d 270, 289-90 & n. 29 (S.D.N.Y. 2010) (citing advisory committee's note to Fed. R. Civ. P. 4.1).

asking for it.").) Plaintiffs also fail to cite any legal authority in support of their argument about the minutes and do "not direct[] [the Court] to any statutory provision or regulation requiring that an IEP be produced at the time parents demand." Cerra, 427 F.3d at 193-94. Rather, although like the Second Circuit in Cerra, the Court is "sympathetic to the frustration [plaintiffs] undoubtedly felt in not receiving [the IEP] sooner despite repeated requests," DOE "fulfilled its legal obligations by providing the IEP before the first day of school" in July 2009. Id. at 194 (citing 34 C.F.R. §§ 300.342(a); 300.345(f)); (see also Tr. 1093-94).

E. IEP's Failure to Recommend Parent Counseling

It is undisputed that the IEP does not explicitly list parent counseling as a related service. (See IEP.) It is also undisputed that New York state regulations require parent counseling in cases, such as this one, and that such counseling must be identified in the IEP. See N.Y.C.R.R. §§ 200.4(d)(2)(v)(a)(5); 200.13(d).[5] DOE's psychologist, however, testified that parent training and counseling are "programmatic in the District 74 6:1:1 programs," such as the one proposed for K.L. (Tr. 305-06.) While plaintiffs argue

[5] In their reply, plaintiffs rely on 34 C.F.R. § 300.34(c)(8) to assert that Congress, not just New York State, "mandate[s]" that parent counseling be included as a related service on a student's IEP. (Pls.' Reply at 10.) That provision, however, only defines what the term "related services" may include; it does not mandate the provision of parent counseling. See 34 C.F.R. §§ 300.34(a),(c)(8); see also 20 U.S.C. § 1414(d)(1)(A)(i)(IV).

that workshops for parents every 3-4 weeks "could not even begin to address" K.L.'s behaviors, including her stringing behavior (Pls.' Reply at 10 (citing Tr. 187)), plaintiffs overlook that an IEP must provide only an opportunity for more than "trivial advancement," not "everything that might be thought desirable by loving parents." Walczak, 142 F.3d at 130, 132. Moreover, K.L.'s mother admitted that at the CSE meeting, she agreed with the related-service mandate in the IEP. (Tr. 1150.)

Even if when included in the program itself, parent counseling must still be explicitly listed in the IEP, such a procedural error is insufficient to amount to a denial of a FAPE. See M.N. v. N.Y. City Dep't of Educ., 700 F. Supp. 2d 356, 367-68 (S.D.N.Y. 2010) (determining that a provision for parent training was unnecessary to satisfy the IDEA where such training was integrated at the placement). Although plaintiffs cite R.K. v. N.Y. City Dep't of Educ., No. 09-4478, 2011 U.S. Dist. LEXIS 32248 (E.D.N.Y. Jan. 21, 2011), appeal docketed, No. 11-1474 (2d Cir. Apr. 15, 2011), in support of their argument that failure to include individualized, parent training as a related service is alone a denial of a FAPE (Pls.' Reply at 11), in that case the failure to specify parent counseling was one of a number of other deficiencies, which "collectively" had "the[]

cumulative effect" of denying a FAPE, R.K., 2011 U.S. Dist. Lexis 32248, at *85-86.[6]

F. P94 @ P15 Was Not Reasonably Calculated for K.L.

Finally, plaintiffs identify a number of alleged deficiencies in the IEP recommendations. As set forth above, the Court properly defers to the SRO's findings, particularly as to the substantive adequacy of an IEP. See M.H., 685 F.3d at 244. The Court finds well-reasoned and supported by the evidence the SRO's findings regarding the adequacy of Ms. Koren's instruction (SRO Decision at 18-19 (citing e.g., Tr. 51-52, 56, 88-89, 133-34, 137-39, 140, 144, 149-50, 158-59, 181-82, 189-90)); the provision of sufficient 1:1 attention for K.L. (SRO Decision at 18-20 (citing Tr. 138-39, 216-17, 301-02; IEP at 15)); and the lack of a need for home-service (SRO Decision at 20-21 (citing Tr. 1127-28 (describing home services as in part "to maximize [K.L.'s] potential"))).[7] Regarding the IHO's

[6] The other cases cited by plaintiffs in support of their argument are similarly unpersuasive. Although in R.E. v. N.Y. City Dep't of Educ., 785 F. Supp. 2d 28 (S.D.N.Y. 2011), lists as a relevant fact that no parent counseling or training was recommended for the student, it does not discuss that fact as part of the analysis for why the student was denied a FAPE. See id. at 36, 40-44. Additionally, in P.K., the court faulted DOE for not providing individualized speech therapy, not for failing to provide individualized parent counseling. 819 F. Supp. 2d at 109-10.

[7] The Court disagrees with plaintiffs' contention in their reply that the SRO only made "a generalized finding that the 6:1:1 program is well-suited for all students who have highly intensive needs without distinguishing and addressing K.L.'s specific needs." (Pls.' Reply at 3.) The SRO described in detail how the IEP addressed K.L.'s individual "academic, social, and behavioral needs," including her stringing behaviors. (SRO Decision at 17-18.) The SRO then addressed how the 6:1:1 placement could address K.L.'s unique needs for 1:1 instruction (id. at 18-19 (citing Tr. 138-139)), sensory support (id. at 18; see also IEP at 16), her communication goals (SRO

finding that K.L. needed 1:1 instruction, the SRO properly acknowledged the contrary evidence and weighed it against the evidence on which he relied -- a weighing much better suited to the SRO than this Court. (SRO Decision at 19); see also Grim, 346 F.3d at 383.

With respect to P94 @ P15 being an "unsafe atmosphere" for K.L., the SRO also properly stated the law precluding from consideration issues raised at the impartial hearing that were not first alleged in the due process complaint or agreed to by the opposing party. (SRO Decision at 20 (citing 20 U.S.C. §§ 1415(c)(2)(E)(i)(II),(f)(3)(B); 34 C.F.R. §§ 300.508(d)(3)(i)-(ii), 300.511(d); 8 N.Y.C.R.R. §§ 200.5(i)(7)(b), (j)(1)(ii)).) Plaintiffs' contention that the issues of the stairs and the school's appearing on DOE's "persistently dangerous" list are properly covered by the allegation in their due process complaint that "[t]o the extent, if at all, that 'placement' was proposed by the NYCDOE outside of the IEP meeting, such placement and program was not appropriate . . ." is unavailing. (Ex. P-E at 3 (emphasis added); Pls.' Reply at 7.) Such allegation clearly reflects a concern about the placement's

Decision 19; see also IEP at 8-9) and assessment needs (SRO Decision at 19), in conjunction with her individual, related-service sessions and her 1:1 crisis paraprofessional. Moreover, at least four of the five students in Ms. Koren's 6:1:1 class in the summer of 2009 had autism, not other, disparate disorders. (Tr. 60-61 (the fifth student was diagnosed with PDD).)

selection “outside of the IEP meeting,” not with the placement itself.

With respect to plaintiffs’ argument about P94 @ P15 having “significant problems” meeting students’ related services mandates (which was not raised in the due process complaint either (see Ex P-E)) (Pls.’ Mem. at 18 (citing Ex. P-HH)), the DOE statistical report on which plaintiffs rely is not probative of whether K.L. would have received the services in her IEP, relative to the sworn testimony at the impartial hearing. Specifically, Ms. Koren testified that P94 @ P15 would have been able to meet K.L.’s related services recommendations (Tr. 166-69), and Ms. Higgens, a speech and language therapist at the school, testified that all students who attended the school during the 2009-2010 year received their mandated speech and language therapy (Tr. 391-92, 396-98).

Plaintiffs also make two general arguments about the evidence relied on by the SRO in finding that DOE provided K.L. with a FAPE, neither of which is persuasive. First, plaintiffs repeatedly argue that the SRO erred in considering testimony from DOE’s witnesses about what the IEP “would have” provided for if K.L. had enrolled at P94 @ P15. Plaintiffs allege that DOE, by its testimony, was improperly trying to “‘cure’ the programming deficiencies” in the IEP (Pls.’ Reply at 9) and cite cases where district courts in this Circuit have found such

“curing” testimony to be insufficient to overcome flaws in IEPs, R.K., 2011 U.S. Dist. LEXIS 32248, at *66-67 (rejecting “subsequent testimony that the recommended placement might have later sought to cure those deficiencies”); see also R.E., 784 F. Supp. 2d at 41-42.

Here, the testimony in question elucidates what the IEP already offers, demonstrating how it would function in the context of the particular placement (which the Second Circuit has said need not be identified in the IEP), not augmenting its services. The Second Circuit itself has taken into account such evidence extrinsic to help determine the appropriateness of a proposed placement, T.Y., 584 F.3d at 419 (deferring to administrative determination that failure to provide FBA or BIP did not deny FAPE where there was “substantial evidence in the record” that 1:1 aide provided actual benefit in addressing problematic behaviors), as have other courts in this district, E.M. v. N.Y. City of Dep’t of Educ., No. 09 Civ. 10623, 2011 U.S. Dist. LEXIS 29074, at *23-24 (S.D.N.Y. Mar. 14, 2011) (considering testimony about the nature of the placement actually offered); W.T., 716 F. Supp. 2d at 289 (testimony as to periodic evaluation of goals at the placement sufficient to

overcome lack of methods of measurement in the IEP).[8] Moreover, the Court agrees with DOE that it would be anomalous and unfair for plaintiffs to be able to rely on ex-post testimony from the MCC program director and K.L.'s MCC teacher as to the appropriateness of the MCC program, but not for DOE to provide equivalent testimony about P94 @ P15.[9] (Def.'s Mem. at 18.)

Second, plaintiffs argue that the SRO erred when he failed to consider the fact that Ms. Koren's class moved to a new building on September 1, 2009, or to address DOE's argument at the hearing that because K.L.'s parents rejected the placement in the summer, DOE did not need to defend the placement from fall 2009 on. (Pls.' Mem. at 14-17.) As an initial matter, plaintiffs cite no evidence in support of their conclusory assertion that DOE knew or should have known that K.L. would be moving to a new building when it issued its FNR or by the start of the 2009-2010 school year in July 2009. (Id. at 15; see also Def.'s Mem. at 22.) Similarly, plaintiffs cite no evidence that DOE knew or should have known that Ms. Koren would not be K.L.'s teacher all year at the time of the placement -- Ms. Koren,

---

[8] Notably, the Second Circuit "has never ruled on whether district courts may consider retrospective evidence in assessing the substantive validity of any IEP." T.P., 554 F.3d at 251-52 n.1.

[9] Plaintiffs also distort the Supreme Court's decision in Forest Grove Sch. Dist. v. T.A., 129 S. Ct. 2484 (2009), which has no bearing on this issue. The question presented (and resolved) in that case was whether the IDEA "categorically prohibit[s] reimbursement for private-education costs if a child has not previously received special education and related services under the authority of a public agency." Id. at 233; (see also Pls.' Reply at 8-9).

herself, did not have that knowledge, testifying that she “might” have been K.L.’s teacher all year long. (Tr. 184-85.) Even if DOE did know, or should have known, about the move, however, plaintiffs cite no law that failure to list a future change in buildings on an FNR amounts to an actionable procedural violation of the IDEA. Cf. Concerned Parents & Children for the Continuing Ed. Of Malcolm X v. N.Y. City. Bd. of Educ., 629 F.2d 751, 753-56 (2d Cir. 1980) (holding that the prior notice and hearing requirements in 20 U.S.C. § 1415(b) are not triggered by a decision to transfer handicapped students from one school to another where they “remain in the same classification, the same school district, and the same type of educational program”); cf. also T.Y., 584 F.3d at 419-20 (concluding that an IEP requires a “general educational program,” not a “specific school location”).

Additionally, with respect to the substantive adequacy of the IEP, plaintiffs are correct that a FAPE is for a 12-month school year. The IDEA, however, only requires that a school district have an IEP in effect at the beginning of the applicable school year. 34 C.F.R. § 300.323(a); 8 N.Y.C.R.R. § 200.4(e)(1)(ii). The SRO found that, as of the first day of school, K.L.’s IEP was reasonably calculated to enable her to receive educational benefits. (See SRO Decision at 21; see also id. at 14-15 (acknowledging plaintiffs’ argument that DOE failed

to present evidence regarding the entire school year, also made to the SRO).)

IV. CONCLUSION

In light of the foregoing, the Court DENIES plaintiffs' motion and GRANTS defendant's motion. The Clerk of the Court is directed to terminate the motions at Docket Numbers 8, 11 and 19, and to close this case.

Dated: New York, New York
August 23, 2012

Katherine B. Forrest

KATHERINE B. FORREST
United States District Judge